UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KENNETH SCOTT,

                        Plaintiff,

       v.

DANIEL CAMBISI,[1]

                    Defendant.
_____

DECISION & ORDER

20-CV-6388MWP

## PRELIMINARY STATEMENT

Plaintiff Kenneth Scott has sued Daniel Cambisi pursuant to 42 U.S.C. § 1983, alleging that Cambisi violated his constitutional rights while he was a pretrial detainee at the Monroe County Jail. (Docket # 1). Specifically, Scott asserts that Cambisi used excessive force against him during an incident that occurred on November 24, 2017. (*Id.*).

Currently pending before the Court are Cambisi's motion for summary judgment and his motion to seal. (Docket ## 38, 50). Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment. (Docket # 12).

Cambisi maintains that he is entitled to summary judgment because Scott failed to properly file a grievance with the facility before commencing this lawsuit and thus failed to exhaust his administrative remedies. (Docket # 38-5 at 5-6). He also contends that summary judgment is warranted because the force that he used was objectively reasonable and the injury

_____

[1] By stipulation filed February 28, 2024, the parties agreed that the correct name of the defendant is "Daniel Cambisi," not "Donald Cambisi." (Docket # 53). The Clerk of the Court is directed to correct the caption of this action.

suffered by Scott was *de minimis*.  (*Id.* at 6-10).  Cambisi also argues that he is entitled to qualified immunity.  (*Id.* at 10-11).  Finally, Cambisi seeks dismissal of the official capacity claim asserted against him on the grounds that Scott has failed to allege that any municipal policy or custom caused his injuries.  (*Id.* at 11).

Scott opposes Cambisi's motion,[2] contending that his fear of retribution rendered the grievance process unavailable to him, and that, in any event, the administrative process was exhausted through his mother's communications on his behalf.  (Docket # 43-2 at 6-7).  Scott also maintains that genuine issues of material fact exist concerning the severity of his injuries and whether the force used by Cambisi was excessive, which preclude summary judgment on his claim for excessive force.  (*Id.* at 7-12).

## FACTUAL BACKGROUND

### I.      November 24, 2017 Incident

The following facts appear undisputed except where otherwise noted.  Scott was incarcerated as a pretrial detainee at the Monroe County Jail ("MCJ") on November 24, 2017, and Cambisi was employed as a deputy at MCJ at that time.  (Docket ## 38-1 at ¶ 1; 43-3 at ¶ 1).  At approximately 11:12 a.m., Cambisi was escorting Scott from the visiting area to his cell block.  (Docket ## 38-1 at ¶¶ 3-4; 43-3 at ¶¶ 3-4).  Cambisi and Scott exited the elevator on the floor on which Scott's cell was located, and Scott proceeded down the hall to a T-intersection. (Docket ## 38-1 at ¶ 4; 43-3 at ¶ 4; County Exhibit ("C. Ex.") 6).

---

[2]  Scott filed the exhibits in support of his opposition three separate times on the Court's electronic docket. (Docket ## 43-1; 44; 45).  During oral argument on the motion, Scott's attorney informed the Court that Docket # 44 contains the correct version of the exhibits.  Accordingly, the Court will cite to Docket # 44 when referencing plaintiff's exhibits.

Although Scott's cell block area was located to the right of the intersection, Scott turned left in order to talk to the inmates in another cell block.  (Docket ## 38-1 at ¶¶ 4-5; 43-3 at ¶¶ 4-5).  Cambisi followed Scott and instructed him to go to his own cell block.  (Docket ## 38-1 at ¶ 6; 43-3 at ¶ 6).  A verbal dispute ensued as Scott and Cambisi walked back down the hall towards Scott's cell block, which ultimately escalated into the altercation that gives rise to this lawsuit.  (Docket ## 38-1 at ¶¶ 7-9; 43-3 at ¶¶ 7-9).  The parties dispute the precise events that precipitated and occurred during the physical altercation, but no dispute exists that Cambisi punched Scott in his face while holding a set of keys.  (Docket ## 38-1 at ¶¶ 8-9; 38-3 at ¶¶ 3-5, 8-9; 43-3 at ¶¶ 8-9, 26-28).

According to Scott, as he and Cambisi returned towards Scott's cell block, Cambisi pushed him from behind, causing him to stumble.  (Docket # 44 at 50-51).  Scott told Cambisi that he was going to "write [him] up" and attempted to walk back past Cambisi in order to speak with Corporal Duge, Cambisi's supervisor, who was located at a desk in the hallway by the elevator.  (*Id.* at 51-54).  Scott maintains that he called Corporal Duge's name, at which point Cambisi punched him in the eye.  (Docket ## 43-3 at ¶ 26; 44 at 54-55).

Cambisi disputes Scott's account.  According to Cambisi, as they walked towards the area of Scott's cell block, Scott was arguing with Cambisi and disobeying his direct orders.  (Docket ## 38-3 at ¶ 11; 49 at ¶ 26).  Cambisi states that he punched Scott because he believed that Scott was about to hit him.  (Docket # 38-3 at ¶¶ 4, 11).

After the altercation, Scott received a medical evaluation and treatment for a laceration to his right eye lid.  (Docket ## 38-1 at ¶ 11; 43-3 at ¶ 11).  Subsequently, Scott attended several appointments with an outside physician for complaints of blurry vision.  (Docket ## 38-1 at ¶¶ 18-21; 43-3 at ¶¶ 18-21).

Scott was placed in the Solitary Housing Unit ("SHU") as a result of the incident. (Docket ## 49-3 at 182; 54).

## II.     <u>Post-Incident Complaints and Investigations</u>

Following the November 24, 2017, incident, Scott and his mother submitted various complaints and communications to several different individuals and agencies.  The parties do not dispute the authenticity of those communications, although they disagree about their legal significance.

### A.     <u>November 26, 2017 Complaint to NYS Attorney General</u>

On November 26, 2017, two days after the incident, Scott's mother, Norvella Hill-Junious, submitted an electronic complaint to the Rochester Regional Office of the New York State Attorney General ("NYS AG"), Consumer Frauds Bureau.  (Docket # 44 at 11-13). Hill-Junious reported that her son had been injured when an MCJ deputy hit him in the eye using his keys.  (*Id.*).  According to Hill-Junious, the keys had punctured her son's eye, causing bleeding, pressure, and impaired vision.  (*Id.*).  She requested that he be transported to Strong Memorial Hospital for treatment.  (*Id.*).

By email to Hill-Junious on March 4, 2018, Edward Krenzer, a Major with the Monroe County Sheriff's Office ("MCSO"), informed her that he had received her complaint to the NYS AG and asked her to identify her son so that the complaint could be investigated.[3]  (*Id.* at 22-23).  Hill-Junious responded that day; she identified her son as Kenneth Scott, provided the date of the incident, and indicated that Scott had not received adequate medical attention for his eye.  (*Id.*).  On March 16, 2018, Krenzer replied to Hill-Junious, advising her that Scott had filed

---

[3]  The record is unclear as to when the NYS AG complaint was first provided to MCJ or provided to Krenzer.

a grievance on January 3, 2018 "specific to the matter defined in your communication with the New York State Attorney General," and that, on February 8, 2018, the Citizens' Policy and Complaint Review Council ("CPCRC") had voted to deny the grievance. (*Id.* at 25). The email further advised her that CPCRC "sustained [the] action taken by facility administration in this matter as consistent with New York State Minimum Standards." (*Id.*).

### B.  November 28, 2017 Subject Management Investigation

On November 28, 2017, four days after the altercation, Lieutenant Kaiser submitted an investigation report concerning Cambisi's use of "subject management techniques" on November 24, 2017. (Docket # 38-6 at 53-58). According to the report, Kaiser interviewed Cambisi, Scott, and several witnesses to the altercation, including three inmates and Corporal Duge. (*Id.*). Kaiser also reviewed video footage from the hallways surrounding the incident. (*Id.*). In his report, Kaiser concluded that Cambisi "acted appropriately regarding both the use and level of force applied to overcome the resistance and achieve compliance of [Scott]." (*Id.* at 58).

### C.  December 4, 2017 Communication by Scott to Horan

Approximately ten days after the incident, while still confined to a cell in SHU, Scott submitted an Inmate Internal Communication Form ("ICF") addressed to Major Horan. (Docket # 54).[4] Scott asked to meet with Horan to provide his version of the November 24 incident. (*Id.*). Scott reported that Cambisi's "use of force was not called for and especially not with a weapon in the officer[']s hands (keys)" and that the keys had "penetrated" Scott's eye. (*Id.*). Scott complained of eye pain and loss of vision. (*Id.*). Scott also complained about being placed in segregation, as well as the loss of certain privileges, including restrictions on his gym

---

[4] Portions of the copy of this exhibit originally filed by defendants were illegible. (Docket # 38-6 at 44-46). At the Court's request, defendant provided a more legible version which has been filed at Docket # 54.

attendance and loss of contact visits.  (*Id.*).  Scott requested that his visits and recreation be

restored and that he be "taken off chains [and] cuffs."  (*Id.*).  Horan responded the next day and

indicated that he would meet with Scott.  (*Id.*).  Horan also advised that he had "reduced [Scott's]

restrictions and relocated [Scott] from the SHU to a corridor cell."  (*Id.*).

### D.    December 7, 2017 Complaint to NYS Governor

On December 7, 2017, Hill-Junious wrote to the New York State Governor.

(Docket # 44 at 15-16).  Hill-Junious advised that Scott had been unjustifiably "assaulted" by a

corrections officer at MCJ, who "placed a ring of keys arounds his knuckles and punched [Scott]

in his right eye, puncturing the eye [and] causing serious injury and loss of vision to the eye."

(*Id.*).  Hill-Junious reported that Scott remained in solitary confinement and was not receiving

adequate medical treatment.  (*Id.*).

Hill-Junious's correspondence was apparently forwarded by the governor's office

to the New York State Department of Corrections and Community Services ("DOCCS") on

December 8, 2017.  (*Id.* at 15).  DOCCS responded on December 19, 2017, indicating that Scott

was being detained in a county jail and that complaints should be directed to the New York State

Commission of Correction ("SCOC").  (*Id.*).  On December 21, 2017, the governor's office

forwarded the correspondence to SCOC.  (*Id.*).  On December 26, 2017, Terrence W. Moran,

SCOC Director of Operations, forwarded Hill-Junious's correspondence to Patrick M. O'Flynn,

the Monroe County Sheriff.[5]  (Docket # 44 at 20).  Moran's letter to O'Flynn requested "that an

---

[5]  During oral argument, Scott's attorney suggested that this letter was sent to O'Flynn by the NYS AG's office; however, the letterhead indicates that it was sent by SCOC.  (Docket # 44 at 20).  He also suggested that the correspondence from Hill-Junious referenced in the letter was the communication that Scott's mother sent to the NYS AG on November 26, 2017.  (*Id.* at 11-13).  Review of the emails between the Governor's office and SCOC, however, suggests that the correspondence referenced by Moran was Hill-Junious's December 7, 2017 complaint to the Governor.  (*Compare* Docket # 44 at 15-16 *with* Docket # 44 at 20).  Indeed, reference number 88243 is notated on both the email chain between the Governor's office and SCOC forwarding the December 7, 2017 complaint and the December 26, 2017 letter from Moran to O'Flynn.  (Docket # 44 at 15, 20).

investigation be made of this complaint and the Commission be apprised of your findings by February 27, 2018." (*Id.*).

### E.       **January 8, 2018 Grievance**

On January 3, 2018,[6] approximately forty days after the incident, Scott submitted a grievance form relating to the November 24, 2017 incident. (Docket # 38-6 at 34-35). His grievance stated:

> I was denied pain medicine when I am suffering from a serious eye
> injury where I was stabbed in the eye. The nurse that denied me
> meds also told me she doesn't specialize in eye injuries but yet
> tried to tell me I'm fine but as a result I'm blind [and] also have
> nerve damage. Not to mention I suffer from a lot of pain. I also
> have a low fever [and] she denied me treatment for that. [A]ll of
> this took place today January 3rd approximately 1:30 p.m. in
> Medical. [T]he nurse involved name is Ms. Worth.

(*Id.*). Scott requested that the nurse be terminated from employment. (*Id.*).

Scott's grievance was denied on the merits on January 8, 2018, and Scott appealed the denial to the Chief Administrative Officer on January 9, 2017. (*Id.*). That appeal was denied on January 11, 2018, and Scott appealed the determination to CPCRC on January 12, 2018. (*Id.*). On February 8, 2018, CPCRC voted to deny the grievance and to sustain the action taken by the facility administration. (Docket # 38-6 at 42).

### F.       **February 2019 Communications with MCJ Staff**

Scott's attorney, Anthony J. LaDuca, Esq., was retained on January 19, 2019. (Docket # 43 at ¶ 9). According to LaDuca, he spoke with Hill-Junious, who informed him that "after the assault [Scott] directed [her] to file a grievance for her son outside of [MCJ] due to concerns of retribution." (*Id.* at ¶ 7). In February 2019, LaDuca instructed his paralegal, Mary

---

[6]  Although the grievance is dated January 3, 2017, the information in the record indicates that the grievance was actually filed in January 2018.

Jane Kemnitz, "to contact the [MCJ] and determine if a grievance regarding the alleged assault of [Scott] by [Cambisi] was opened and administratively completed." (Docket ## 43 at ¶ 11; 43-4 at ¶ 2). According to Kemnitz, she spoke with Sergeant Harris, "who informed [her] that there was a grievance regarding the alleged assault of [Scott] and the process was completed with no additional review or remedies available at the [MCJ]." (Docket ## 43-4 at ¶ 5; 44 at 88). At LaDuca's direction, Kemnitz asked MCJ staff to provide a letter confirming that the grievance process had been completed. (Docket # 43-4 at ¶ 6). According to Kemnitz, no one at MCJ provided the requested letter. (*Id.* at ¶ 7).

On February 26, 2019, LaDuca sent a letter to MCJ to attempt to confirm that the grievance process had been completed. (Docket ## 43 at ¶ 13; 43-4 at ¶¶ 7-8; 44 at 9). Specifically, he stated:

> I am writing to confirm that [Scott's] grievance regarding the incident that took place . . . on or about November 24, 2017 was completed with the [MCJ] facility. [Scott] was interviewed extensively after the incident on November 24, 2017 and is not aware of whether the administrative process was completed, and/or any additional remedies are available at the [MCJ] regarding [Scott's] grievance.

(Docket # 44 at 9). According to LaDuca, he did not receive any response to his letter, and he filed the complaint initiating this lawsuit on June 11, 2020. (Docket ## 1; 43 at ¶ 15).

### III.    MCJ Grievance Policy

In support of his motion for summary judgment, Cambisi has submitted a Declaration from Sergeant Carolyn Derousie, the Grievance Coordinator for MCJ. (Docket # 38-4). According to Derousie, each inmate at MCJ receives a copy of the Inmate Handbook upon entering the facility. (*Id.* at ¶ 7). The handbook outlines the procedure to be followed by

8

an inmate in order to submit and resolve complaints and grievances.[7]  (Docket ## 38-4 at ¶¶ 9-11; 38-6 at 20-21).

According to the handbook, an inmate first should attempt to resolve any complaints with their housing area supervisor and then, if unable to resolve the complaint, speak with the duty sergeant on rounds.  (Docket # 38-6 at 20).  If those efforts do not resolve the inmate's complaint, the inmate should ask the housing area supervisor for an Inmate ICF.  (*Id.*). According to the handbook, the inmate should direct the ICF to the facility Superintendent, who will review the complaint and determine whether a remedy is warranted.  (*Id.*).

If the inmate is not satisfied by the complaint procedure, the inmate may request a grievance form from the housing supervisor.  (*Id.*).  The grievance must be filed within five days "of the date of the act or occurrence giving rise" to the complaint and must be "specific" and provide sufficient information about the inmate's complaint.  (*Id.* at 21).  After submission, the Grievance Coordinator will answer the grievance within five business days of receipt of the grievance.  (*Id.*; *see also* 9 N.Y.C.R.R. § 7032.4(i) ("[w]ithin five business days of the receipt of a grievance, the grievance coordinator shall issue a written determination").  Any appeal of the decision must be made to the Superintendent within two business days of receipt of the Grievance Coordinator's decision.  (*Id.*; *see also* 9 N.Y.C.R.R. § 7032.4(j) ("[w]ithin two business days after receipt of the grievance coordinator's written determination, the grievant may appeal to the chief administrative officer or his designee").  The Superintendent will provide a written determination within five business days; any appeal of that determination must be taken to CPCRC within three business days.  (*Id.*; *see also* 9 N.Y.C.R.R. §§ 7032.4(k); 7032.5(a)).

---

[7]  "Title 9, Subtitle AA, Chapter I of the New York Codes, Rules and Regulations ("NYCRR") outlines the 'Minimum Standards and Regulations for Management of County Jails and Penitentiaries,' including those that apply to a formal inmate grievance procedure."  *Dickinson v. York*, 828 F. App'x 780, 782 (2d Cir. 2020) (citing 9 N.Y.C.R.R. § 7032.1 – 7032.12).

In her declaration, Derousie represents that, as Grievance Coordinator for MCJ, she is responsible for supervising the grievance process and ensuring the proper documentation and filing of all grievances at the facility. (Docket # 38-4 at ¶¶ 2-3). According to Derousie, the only grievance filed by Scott relating to the November 24, 2017, incident was the January 3, 2018 grievance. (*Id.* at ¶¶ 12-13). The parties agree that the January 2018 grievance concerned only the adequacy of the medical treatment Scott received for his eye injury and did not complain about Cambisi's use of force. (Docket ## 38-1 at ¶ 15; 43-3 at ¶ 15).

## IV.   Scott's Deposition

During his deposition, Scott was asked whether he had submitted a grievance relating to the force that Cambisi used on November 24, 2017. (Docket # 49-3 at 182). Initially, Scott testified that he could not recall but that he did not believe he had an opportunity to file a grievance because he had been placed in SHU and had not been provided materials such as a pen and paper. (*Id.* at 182-84). According to Scott, he asked for several items but initially did not receive them. (*Id.*). Following that testimony, Scott was asked specifically whether he had asked for a grievance form. (*Id.* at 184). He responded, "I don't – I can't even remember honestly." (*Id.*). In response to the question "So you're not sure if you asked for – for a grievance form or not," Scott reiterated, "I – I don't recall honestly." (*Id.* at 185).

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this determination, the court must assess whether there are any

disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable

inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

(1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). A

fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.

2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also

Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

   The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the non-moving party must come forward with

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant

v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must

do more than make broad factual allegations and invoke the appropriate statute. The [party]

must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific

factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

   As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them. Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution . . . . [I]t must be kept in mind

11

> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).


## I.      <u>Official Capacity Claims</u>

Scott's Amended Complaint asserts an excessive force claim against Cambisi in both his individual and official capacity.  (Docket # 3-1).  Cambisi seeks dismissal of the official capacity claim on the grounds that Scott has failed to allege that his injuries were the result of any official municipal policy or custom.  (Docket # 38-5 at 11).  Scott's opposition papers did not address this argument.  (*See* Docket # 43-2).  During oral argument on the motion on September 12, 2023, Scott's counsel confirmed that Scott did not oppose dismissal of the official capacity claim.  Accordingly, this portion of defendant's motion is granted, and the official capacity claim is dismissed.


## II.     <u>Administrative Exhaustion</u>

The Prison Litigation Reform Act of 1995 ("PLRA") requires an inmate to exhaust available administrative remedies before filing any lawsuit regarding the general circumstances or particular episodes of prison life, including claims of excessive force.  *See Ross v. Blake*, 578 U.S. 632, 635 (2016) (citing 42 U.S.C. § 1997e(a)); *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "Exhaustion is mandatory – unexhausted claims may not be pursued in federal court."  *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011).

The PLRA requires "proper exhaustion," meaning a prisoner must use "all steps that the agency holds out, and do[] so *properly* (so that the agency addresses the issues on the merits)."  *Woodford v. Ngo*, 548 U.S. 81, 91 (2006).  Accordingly, "the exhaustion inquiry

12

requires that the court look at the . . . prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Boyd v. Deasis*, 524 F. Supp. 3d 128, 145 (W.D.N.Y. 2021) (quoting *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (alterations omitted)); *see also Merritt v. Hicks*, 2020 WL 5822274, *9 (N.D.N.Y.) ("[t]o properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the institution to which they are confined"), *report and recommendation adopted by*, 2020 WL 5821496 (N.D.N.Y. 2020).

Failure to exhaust is an affirmative defense, and a plaintiff need not specifically plead or establish exhaustion in his or her complaint. *Rucker v. Giffen*, 997 F.3d 88, 92 (2d Cir. 2021). Because non-exhaustion is an affirmative defense, "the defendant bears the burden of proving that a prisoner has failed to exhaust his available administrative remedies." *Poulos v. Grimaldi*, 2021 WL 3771981, *8 (N.D.N.Y. 2021). An "available" remedy is one that is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). "However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by persuading the Court of either exhaustion or unavailability." *Poulos v. Grimaldi*, 2021 WL 3771981 at *8. Relevant to this case, "an administrative remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentations, or intimidation." *Ross*, 578 U.S. at 644.

A.      <u>**Whether Scott Exhausted Administrative Remedies**</u>

Cambisi maintains that he is entitled to summary judgment dismissing Scott's excessive force claim because MCJ had an available administrative grievance process and Scott failed to exhaust his administrative remedies relating to Cambisi's use of force through that process.  As noted above, Cambisi has submitted the declaration of Derousie, the Grievance Coordinator at the facility, describing the process for inmates to address complaints while incarcerated at MCJ.  As described above, that process, which is set forth in the inmate handbook, requires informal attempts to resolve the issue with a housing supervisor and through an ICF directed to the facility Superintendent.  If those informal steps do not resolve the problem, the inmate must complete and file a grievance form within five days of the act or occurrence giving rise to the complaint.  In the event the inmate is not satisfied with the decision on the grievance, the inmate may appeal to the facility Superintendent and then to CPCRC. Exhaustion of those appeals is a prerequisite to filing a federal lawsuit.  *See Matteo v. Cnty. of Nassau*, 2023 WL 5310587, *6-7 (E.D.N.Y.) (granting summary judgment based upon plaintiff's failure to fully exhaust administrative remedies pursuant to county grievance procedures because plaintiff failed to appeal denial of his grievance), *report and recommendation adopted by*, 2023 WL 5310874 (E.D.N.Y. 2023); *Quinn v. Stewart*, 2012 WL 1080282, *4 (S.D.N.Y.) ("[t]he administrative grievance process is fully exhausted in a county jail in New York State after three steps are completed: (1) a grievance is filed with and denied by the facility's Grievance Coordinator; (2) the grievance denial is appealed to and denied by the Chief Administrative Officer; and (3) the CPCRC, which is part of the SCOC, denies the final appeal of the grievance"), *report and recommendation adopted by*, 2012 WL 1080145 (S.D.N.Y. 2012).

14

In her declaration, Derousie represented that a thorough review of Scott's inmate file was conducted and that the only grievance Scott filed related to the November 2017 incident was the January 3, 2018 grievance.  (Docket # 38-4 at ¶ 13).  Although the January 2018 grievance was fully exhausted through appeals to the Superintendent and CPCRC, defendants maintain that the grievance – because it related solely to the medical care Scott received for his eye injury – did not exhaust Scott's administrative remedies with respect to his claim for excessive force.  (Docket # 38-5 at 6).  I agree that the January 2018 grievance did not satisfy the exhaustion requirement.

As an initial matter, the grievance was filed approximately forty days after the alleged use of excessive force and therefore would have been an untimely use of force grievance pursuant to MCJ's grievance procedures.  *See Johnson v. Jayne*, 2015 WL 11988851, *5 (W.D.N.Y. 2015) ("[t]he dismissal of grievances as 'untimely' constitutes failure to exhaust") (quotation omitted) (collecting cases).  Indeed, Scott does not appear to argue that the January 2018 grievance exhausted his remedies as to his excessive force claim.  Rather, Scott has conceded that the grievance "only complained of [Scott's] medical treatment he received at the jail for his alleged eye injuries, and did not complain about the underlying use of force." (Docket # 43-3 at ¶ 15).  "The scope of an inmate's lawsuit is . . . limited by the scope of the fully exhausted grievance."  *High v. Jun*, 2021 WL 3682737, *3 (W.D.N.Y. 2021) (internal quotations omitted).  Because the grievance did not concern the alleged use of excessive force, it did not exhaust Scott's administrative remedies for that claim.[8]  *See Wilson v. McKenna*, 661

---

[8]  Although "a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated," *Percinthe v. Julien*, 2009 WL 2223070, *4 & n.59 (S.D.N.Y. 2009) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)), nothing in the grievance or CPCRC determinations suggests that Cambisi's conduct was investigated as part of the grievance process.  (Docket # 38-6 at 33-42).  To the contrary, the grievance documents demonstrate that the grievance investigation was limited to Scott's medical complaints. (*Id.*).

F. App'x 750, 752 (2d Cir. 2016) (plaintiff failed to exhaust excessive force claim where one form he filed "requested only medical care in the narrative portion of the form" and the other "mentioned the alleged incident with [defendant], but complained only about his lack of medical treatment"); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) ("[i]n order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures"); *Poulos*, 2021 WL 3771981 at *9 (rejecting argument that grievance concerning medical issue exhausted excessive force complaint; "[p]laintiff . . . clearly referenced the alleged assault in [the grievance] only to provide context for his allegations underlying his medical-misconduct grievance[;] . . . [the grievance] described only issues with [p]laintiff's medical care; it did not describe a problem with the force used against him"); *James v. Suffolk Cnty. Corr. Fac.*, 2018 WL 3966688, *9 (E.D.N.Y.) ("no timely grievance was filed by [plaintiff] regarding his assault or the medical treatment he received[;] . . . [r]ather, [p]laintiff filed a grievance nearly two months after the incident, which referenced the assault but addressed only housing decisions made by the [f]acility and disciplinary issues pertaining to other inmates"), *report and recommendation adopted by*, 2018 WL 3966241 (E.D.N.Y 2018); *Johnson v. Annucci*, 314 F. Supp. 3d 472, 476 (W.D.N.Y. 2018) ("the grievances that plaintiff did file cannot be said to have put defendants on notice of the nature of plaintiff's complaint in this action, nor would the prison authorities reasonably be expected to treat them as raising the issues forming the basis for this action[;] [p]laintiff's filing of those grievances was therefore insufficient to meet the exhaustion requirement[] as to the claims he has raised in this lawsuit").

Despite the failure to file a grievance regarding Cambisi's use of force, Scott maintains that his administrative remedies were nevertheless exhausted because his mother filed

16

complaints on his behalf to various state agencies and authorities. (Docket # 43-2 at 7). He also
contends that his attorney's subsequent pre-suit communications with MCJ facility staff
demonstrate that he had exhausted his administrative remedies.[9] (*Id.*). For the reasons discussed
below, I disagree that Ms. Hill-Junious's complaints or Scott's attorney's communications
satisfied the exhaustion requirement for Scott's excessive force claim.

Communications by an inmate's family members to facility staff or other agencies
are generally insufficient to exhaust an inmate's administrative remedies. *See Espey v. Rice*,
2020 WL 4368663, *3 (W.D.N.Y. 2020) (no exhaustion where plaintiff's mother sent
correspondence regarding the incident to the Office of Special Investigations); *Avent v. Solfaro*,
2010 WL 2985904, *4 (S.D.N.Y. 2010) ("[t]he oral complaint by [p]laintiff's mother is
insufficient to satisfy the exhaustion requirement"); *see also Willis v. Seabolt*, 2022 WL
3028205, *5 (M.D.N.C. 2022) ("[t]hat [p]laintiff's mother called [defendant] and the [facility]
concerning the confiscation of materials does not change [the conclusion that plaintiff failed to
exhaust]; . . . it is [p]laintiff's responsibility to complete the grievance process"). Implicit in
Scott's contention that his mother's communications exhausted his administrative remedies is the
assertion that his mother had the right to grieve on his behalf. During oral argument, however,
Scott's counsel conceded that Scott's mother had no right to grieve on his behalf unless
administrative remedies were unavailable to him. As discussed in Section B *infra*, Scott's
submissions fail to counter defendant's demonstration that administrative remedies were

---

[9] Scott does not appear to argue that he exhausted his administrative remedies through the ICF he sent to
Major Horan on December 4, 2017. (*See generally* Docket # 43-2). That communication, although it mentioned
Cambisi's use of force and characterized it as unnecessary, primarily addressed his complaint regarding his
placement in SHU and loss of privileges. Indeed, the relief Scott sought was the lifting of the restrictions and the
restoration of his privileges – relief that was apparently provided by Horan. Even if the ICF could be construed as a
complaint that pertained to Cambisi's use of force, it was untimely, as it was filed approximately ten days following
the use of force. Moreover, an "ICF is not a formal grievance." *Boyd v. Deasis*, 524 F. Supp. 3d at 146.

available to Scott.  Because Scott had available administrative remedies, any communications

from his mother cannot be found to satisfy the exhaustion requirement.

        Moreover, even assuming that Hill-Junious had the authority to grieve on behalf

of her son, none of her communications satisfy MCJ's grievance process.  Her November 27,

2028 communication to the NYS AG, although timely, did not serve to exhaust Scott's

administrative remedies for several reasons.  First, it is well-settled that communications sent to

"officials outside of the grievance chain of command . . . do not satisfy the exhaustion

requirement."  *See Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("the benefits of exhaustion

can be realized only if the prison grievance system is given a fair opportunity to consider the

grievance and the prison grievance system will not have such an opportunity unless the grievant

complies with the system's critical procedural rules") (quotations and brackets omitted); *Merritt

v. Hicks*, 2020 WL 5822274 at *11 ("[p]laintiff's complaints, whether verbal or written, even to

a high-ranking official, are outside the purview of the [grievance process], and fail to satisfy the

PLRA's exhaustion requirement"); *Tucker v. Demarco*, 2014 WL 4175801, *5-6 (E.D.N.Y.

2014) ("[c]omplaints to . . . parties that are not part of the facility's grievance procedure do not

constitute 'proper' exhaustion[;] . . . [p]laintiff's complaints to the Attorney General and to

Internal Affairs, without more, do not satisfy the grievance procedures set forth in the Inmate

Handbook, and thus do not properly exhaust administrative remedies pursuant to the PLRA");

*Avent v. Solfaro*, 2010 WL 2985904 at *4 ("prison officials are entitled to require strict

compliance with an existing grievance procedure").

        Even assuming *arguendo* that Hill-Junious's complaint to the NYS AG could be

considered a grievance, it still would fail to satisfy Scott's exhaustion requirement because it

concerned Scott's injuries and alleged lack of medical care, not the force used by Cambisi, which

is the subject of the claim before the Court.  The NYS AG complaint, while it does describe the altercation between Cambisi and Scott, concerns his physical injuries and the facility's alleged inadequate response to those injuries.  (Docket # 44 at 13).  In fact, the relief requested by Hill-Junious was the transfer of her son to a hospital for evaluation and treatment.  (*Id.*).  For this reason, I find that the NYS AG complaint was inadequate to exhaust the use of force claim, let alone put MCJ officials on notice of that claim.

Likewise, Krenzer's response to Hill-Junious's complaint in March 2018 – assuring her that her complaint concerning "an injury your son incurred while in the Monroe County Jail" had been investigated and advising her that the findings had been sustained by CPCRC (Docket # 44 at 22-23, 25) – does not alter the analysis.  That communication between facility staff and plaintiff's mother, which occurred more than two months after the incident, does not reference any earlier communications with MCJ staff within the initial five-day period, and it is unclear how it could be considered retroactive exhaustion (a proposition that, if Scott advances, he does not support with legal authority).  In any event, Krenzer's communications make clear that he interpreted Hill-Junious's complaint to the NYS AG to concern the medical care received by Scott – a complaint which, as Krenzer informed Hill-Junious, was formally grieved and fully exhausted.

Hill-Junious's communications with the Governor's office dictate no different result.  As discussed above, communications to officials, including high-ranking officials, outside of the grievance process do not constitute proper exhaustion.  *See Calderon v. Doe*, 2021 WL 6278740, *6 (N.D.N.Y. 2021) ("[i]nsofar as plaintiff suggests that letters he wrote to Governor Cuomo and Commissioner Annucci constitute an attempt at exhaustion, . . . these letters were sent to officials outside of the grievance chain of command[;] they do not satisfy the

exhaustion requirement") (collecting cases), *report and recommendation adopted by*, 2022 WL 43918 (N.D.N.Y. 2022); *Hurst v. Mollnow*, 2018 WL 4178226, *7 n.9 (N.D.N.Y. 2018) ("[t]o the extent [p]laintiff suggests he exhausted his administrative remedies by contacting the Commissioner, Governor, and Inspector General, among others, . . . the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA") (internal quotations omitted) (collecting cases).  Moreover, while the complaint to the Governor explicitly complained about an "assault" and "excessive use of force," it was sent on December 7, 2017, beyond the five-day period for filing a grievance according to MCJ's grievance procedures.

       That the SCOC subsequently directed an investigation into the use of force as a result of the complaint to the Governor does not satisfy or obviate plaintiff's obligation to exhaust.  *See Perez v. Furina*, 2016 WL 1237863, *11 (N.D.N.Y.) ("the mere fact that [plaintiff] [alerted] the Superintendent about an alleged assault does not mean that the letters suffice to serve as formal grievances[;] . . . though the . . . assault . . . may have been 'investigated,' . . . [that] does not mean that [it was] investigated because [plaintiff] filed a formal grievance"), *report and recommendation adopted by*, 2016 WL 1238243 (N.D.N.Y. 2016).  In addition, even if Hill-Junious's complaint to the Governor, considered in conjunction with SCOC's direction to commence an investigation, could be construed as proper initiation of the grievance process, Scott's failure to appeal to or seek review by CPCRC of the outcome of that investigation as required by MCJ's grievance process is fatal to any assertion that the claim has been fully exhausted.  *See Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 553 (W.D.N.Y. 2018) ("even if [p]laintiff's letter complaint considered in tandem with the [facility staff response] could be construed [as an acceptable initiation of formal grievance procedures], the Court still finds that

[p]laintiff failed to file an appeal to the CPCRC as required by the County Jail's grievance process") (collecting cases), *appeal dismissed sub nom. Scott v. Bouck*, 2020 WL 13555793 (2d Cir. 2020).

Finally, Scott's contention that his attorney's pre-suit communications with facility staff demonstrates that his excessive force claim was properly exhausted is both legally and factually unsupported.  Simply stated, Scott has proffered no legal support for his contention that his attorney's communications with MCJ facility staff that occurred more than one year after the alleged incident somehow renders Scott's excessive force claim administratively exhausted.

Even assuming that those later communications with facility staff could somehow estop Cambisi from asserting the exhaustion defense, the record before the Court does not factually support Scott's contention that the communications conveyed that Scott had exhausted his use of force complaint.  Although Kemnitz, counsel's paralegal, represents that Sergeant Harris verbally informed her that there was a grievance "regarding the alleged assault of [Scott][,]" (Docket # 43-4 at ¶ 5), Kemnitz's declaration provides little specific detail about the content of their conversation, such as, whether Kemnitz made clear to Harris that she was attempting to determine whether a grievance concerning the alleged use of excessive force – as opposed to the medical care Scott received as a result of the altercation – had been filed and exhausted.  At best, and construed in favor of the plaintiff, the declaration establishes that facility staff represented that a grievance relating to the incident had been filed and fully exhausted.  Of course, the record contains a fully exhausted grievance relating to Scott's medical claims arising out of the incident.  As discussed above, the filing and appeal of that grievance did not exhaust Scott's excessive force claim.  Moreover, it is hard to see how any purported reliance on such

conversations could be said to be reasonable in light of the facility's failure to provide the requested written confirmation or respond to counsel's letter.

For the reasons discussed above, I find that defendant has established that a grievance process existed at MCJ and that none of the communications from Scott, his mother, or his attorney properly exhausted his excessive force claim in accordance with MCJ's grievance procedures. Accordingly, I find that defendant has established that Scott failed to exhaust his administrative remedies relating to his excessive force claim.

### B.     Whether Administrative Remedies Were Unavailable to Scott

I turn now to the question whether Scott has raised a triable issue of fact as to the availability of administrative remedies to Scott. *See Poulos*, 2021 WL 3771981 at *8. I find that he has not.

An administrative remedy is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentations, or intimidation." *Ross*, 578 U.S. at 644. The mere fact that a plaintiff was subjected to violence or hostile acts, without more, does not render administrative remedies unavailable because "a generalized fear of retaliation . . . is insufficient as a matter of law to support a finding that [a] grievance process [is] unavailable." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 312 (2d Cir. 2020) ("[t]o hold otherwise would allow any inmate who was claiming that a prison guard violated § 1983 based upon an act of violence or other hostile act in the jail to avoid the PLRA exhaustion requirement because of a generalized fear that any grievance or complaint could lead to more violence by that guard"). Rather, "[a]n inmate must point to some affirmative action by a prison official that prevented the inmate from availing himself of the grievance procedures." *Martinaj v. Uhler*, 2021 WL 3793769, *7 (N.D.N.Y. 2021). For instance, "specific threats of

retaliation or intimidation by prison employees can render administrative remedies unavailable."
*Booker v. Flint*, 2023 WL 3765556, *4 (N.D.N.Y.) ("[d]efendants 'act affirmatively' to intimidate by making verbal and physical threats of retaliation, physically assaulting the plaintiff, denying him grievance forms or writing implements, or transferring the plaintiff"), *report and recommendation adopted by*, 2023 WL 3762822 (N.D.N.Y. 2023).

"[T]o render a grievance process unavailable, a prisoner's fear needs to 'relate[] to threats or intimidation in connection with the *grievance process* itself." *Perez v. Kruger*, 2022 WL 4155654, *3 (W.D.N.Y. 2022) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d at 313) (emphasis added). Thus, although acts of intimidation need not be "tied narrowly to a particular grievance," they cannot be "*wholly unrelated* to the grievance process." *Gunn v. Ayala*, 2023 WL 2664342, *10 (S.D.N.Y. 2023) (quoting *Lucente*, 980 F.3d at 313). Ultimately, "[t]he inquiry into whether grievance procedures were available is 'an objective one: that is, would a similarly situated individual of ordinary firmness have deemed the grievance procedures unavailable." *Martinaj v. Uhler*, 2021 WL 3793769 at *7 (quoting *Lucente*, 980 F.3d at 311-12) (brackets omitted).

During his deposition, Scott testified that Cambisi struck him in the face after he threatened to file a grievance about Cambisi's conduct in "put[ting] [his] hands on [Scott]" during the escort and called out to Sergeant Duge. (Docket # 44 at 51-55). In the memorandum of law submitted in opposition to the pending motion, Scott argues that the MCJ grievance process was unavailable to him because he feared retribution, prompting him to request his mother's assistance in filing a grievance on his behalf. (Docket # 43-2 at 7). LaDuca represents, in his supporting declaration, that Scott's mother informed him "that after the assault [Scott] directed [her] to file a grievance [on his behalf] outside of [MCJ] due to concerns of retribution."

(Docket # 43 at ¶ 7).  The declaration does not explicitly state whether the reported concerns were Scott's, his mother's, or someone else's.

Construed in favor of Scott, the allegation that Cambisi punched him in the face in response to Scott's threats to report Cambisi's conduct certainly may be viewed as an act of intimidation sufficiently connected with "the grievance process itself."  *Perez v. Kruger*, 2022 WL 4155654 at *3.  Stated another way, because Scott alleges that Cambisi struck him in response to Scott's threats to report Cambisi, it cannot be said that Cambisi's allegedly intimidating act was "*wholly unrelated* to the grievance process," *Lucente*, 980 F.3d at 313 (emphasis added), or that a similarly situated inmate would not have plausibly or reasonably considered the grievance process unavailable to him.

The deficiency in Scott's argument is that he has not adduced any admissible evidence that in fact a fear of retribution deterred him from filing a grievance, regardless of whether such a fear could be considered objectively reasonable.  *See McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. 2017) ("[plaintiff] asserted that defendants tried to intimidate him, and intimidation can excuse the failure to exhaust[; ] . . . [h]owever, none of the actions allegedly taken by the defendants actually prevented [plaintiff] from submitting his complaint letter"); *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016) (rejecting unavailability argument where plaintiff filed a grievance; "it cannot be said that the threat interfered with [plaintiff's] exhaustion[;] [h]e was not deterred from exhausting; he simply did not exhaust in accordance with the procedures"); *Heyliger v. Gebler*, 624 F. App'x 780, 783 (2d Cir. 2015) ("[i]t is . . . clear from the record that the threat did not actually deter [plaintiff] from pursuing his administrative remedies[;] [i]t follows that the threat cannot excuse exhaustion").  Significantly, there is no affidavit from Scott himself attesting to a fear of retribution, let alone that such fear

24

intimidated him from filing a grievance about Cambisi's conduct. His Statement of Undisputed Facts submitted pursuant to Rule 56(a) of the Federal Rules of Civil Procedures contains no assertion about fear of intimidation. (*See* Docket # 43-3). Scott's complaint does not contain any such allegations; rather, it asserts that he filed a complaint and exhausted his administrative remedies. (Docket # 3 at ¶ 18). Moreover, his sworn deposition testimony undermines the suggestion that the reason he did not file a grievance was due to fear.

        The sole factual assertion concerning Scott's purported fear is contained in LaDuca's declaration, which represents that LaDuca learned through a conversation with Scott's mother that Scott feared retribution. (Docket # 43-3 at ¶ 7). Of course, "the [c]ourt cannot consider factual assertions made [in an attorney's declaration] that are unsupported by the evidence in the record."[10] *Martinaj*, 2021 WL 3793769 at *8 (rejecting unavailability arguments of plaintiffs who did not provide admissible evidence of retaliation or intimidation). LaDuca's representation concerning a conversation with Scott's mother constitutes inadmissible hearsay and may not be considered on the pending motion.[11] *See Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 601 (S.D.N.Y. 2018) (refusing to consider attorney affirmation describing contents of a conversation with potential witness; "this affirmation contains inadmissible hearsay statements, and the [c]ourt will not consider it in deciding the instant [m]otion") (collecting cases), *motion to vacate denied*, 2019 WL 498253 (S.D.N.Y.), *aff'd*, 798 F. App'x 682 (2d Cir.

---

[10] Cambisi's reply papers identified this absence of admissible evidence (Docket # 49-1 at 2-3) ("[p]laintiff's [a]ttorney argues in his declaration and memorandum of law that [p]laintiff did not file a timely grievance because he feared retribution, but there is no admissible evidence to support this claim"), and the Court addressed it, and its potential consequences for this motion, several times during oral argument. At oral argument, counsel for Scott neither identified any admissible evidence not mentioned in his papers, nor requested leave to supplement his submissions with an affidavit.

[11] Even if Scott's mother could testify about what Scott told her about his state of mind, *see* Fed. R. Evid. 803(3), the record before the Court contains no such statement by her. At most, it contains a statement by counsel as to what she said to counsel about what Scott told her. *See Chum Ltd. v. Lisowski*, 2001 WL 1164664, *1 (S.D.N.Y. 2001) ("the state-of-mind exception cannot rescue double hearsay").

2019); *Isaacs v. Mid Am. Body & Equip. Co.*, 720 F. Supp. 255, 257 (E.D.N.Y. 1989) (attorney

affirmation based upon attorney's conversation with a third party constituted hearsay; "an

affidavit based on such inadmissible evidence violates the rule requiring that affidavits submitted

in connection with summary judgment motions be based on personal knowledge").

        Moreover, the admissible evidence that is in the record undermines Scott's

assertion that he feared retribution if he filed a grievance.  When he was asked during his

deposition why he did not file a grievance, he did not mention intimidation or fear of retaliation.

Rather, he initially testified that he was denied writing materials, but later clarified that he could

not remember whether he had ever requested a grievance form.  This sworn testimony undercuts

his current contention that he was afraid to file a grievance.  *See Lewis v. Wasielewski*, 2018 WL

4732755, *6 (W.D.N.Y.) ("inconsistences and contradictions in plaintiff's deposition testimony

cast further doubt on his claim that he was afraid to file a grievance[;] [n]ot only does plaintiff

contradict himself as to whether he filed a grievance, but he also provides varying rationales as

to why he did not file one"), *report and recommendation adopted by*, 2018 WL 4692476

(W.D.N.Y. 2018).  Additionally, ten days after the incident, he sent an ICF to Horan about his

restrictions and characterized Cambisi's conduct as an "assault[]" with a "weapon" that was

"[un]called for" and "unjust" – a communication that appears at odds with his assertion that he

was too afraid of retribution to file a grievance about the incident.[12]  *See Snyder v. Whittier*, 428

---

[12]  In *Hemphill v. New York*, the Second Circuit observed that "threats or other intimidation by prison
officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing
directly to individuals in positions of greater authority within the prison system, or to external structures of authority
such as state or federal courts."  380 F.3d 680, 688 (2d Cir. 2004), *overruled on other grounds by Ross*, 578 U.S.
632.  The facts before the Court in the instant case are distinguishable from those in *Hemphill* in important respects.
As an initial matter, the plaintiff in *Hemphill* asserted in his complaint that he did not file a grievance due to his fear
of being assaulted because of the defendants' threats.  *Id.* at 684.  Here, the record does not contain a single assertion
by Scott that he feared retribution or that such fear inhibited him from filing a grievance.  In addition, the plaintiff in
*Hemphill* waited approximately five months before filing a complaint with the superintendent.  *Id.* at 683-84.  Here,
Scott sent the ICF within ten days of the incident.  *See Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011)
(distinguishing *Hemphill*; "while [plaintiff's] subjective fear is thus not dispositive, it is nonetheless relevant that

F. App'x at 92 ("[plaintiff's] assertion that he feared retaliation in the first place from
[defendant] is belied by his testimony that he complained [to another officer] within two hours of
the assault"); *Merritt*, 2020 WL 5822274 at *11 (plaintiff's assertion that he did not file a
grievance due to fear of retaliation was "inconsistent with the fact that he proceeded to report the
details of the alleged assaults" to medical staff and other inmates); *Lewis v. Wasielewski*, 2018
WL 4732755 at *6 ("plaintiff's actions after the . . . incident directly contradict his claim that he
did not file a grievance because he feared retaliation by officers at [the facility][;] . . . [i]t defies
logic that plaintiff would be unafraid to file a lawsuit because he believed a transfer of facilities
was imminent, but that he would still be fearful of filing a grievance"); *Galberth v. Plumbly*,
2018 WL 11189327, *3 (N.D.N.Y. 2018) ("[t]he [c]ourt finds that [p]laintiff's own testimony
undermines his contention that he was intimidated from pursuing timely grievances[;] [p]laintiff
disclosed the incidents to three separate medical staff members . . . shortly after they occurred");
*see also Lutz v. Francisco*, 2020 WL 9264825, *5 (N.D.N.Y. 2020) ("the Second Circuit has
concluded that when an inmate files a grievance, notwithstanding the threats of retaliation and
intimidation of which that inmate complains, the failure to fully exhaust under the PLRA will not
be excused on this ground") (collecting cases), *report and recommendation adopted by*, 2021
WL 868618 (N.D.N.Y. 2021).  On this record, I find that Scott has failed to raise a triable issue
of fact that administrative remedies were unavailable to him.

　　　　Because I conclude that Cambisi has established that Scott failed to exhaust
administrative remedies with respect to the excessive force claim before the Court, and that Scott
has failed to raise a triable issue of fact that those remedies were unavailable, Cambisi is entitled
to summary judgment dismissing the action.  I do not reach Cambisi's remaining arguments.

two hours after the assault, [plaintiff] complained to [another corrections officer], who [plaintiff] testified was
friendly with [defendant]").

III.    **Motion to Seal**

       On August 8, 2023, Scott filed a motion to seal all of the exhibits he submitted in

opposition to Cambisi's motion for summary judgment, contending that several of the exhibits he

submitted qualify as confidential pursuant to the terms of the stipulated confidentiality order.

(Docket ## 43-1; 44; 45; 47-1 at ¶ 3).  By Decision and Order dated August 11, 2023, the Court

denied plaintiff's motion to seal without prejudice to renewal, noting that Scott's motion was not

narrowly tailored and that it failed provide a basis for sealing sufficient to overcome the

presumption of public access to judicial documents.  (Docket # 48).  The Court directed that the

exhibits remain sealed pending any renewed motion to seal filed by either party.  (*Id.*).

       On August 18, 2023, Cambisi filed a motion to seal Exhibits I and J[13] submitted

in support of plaintiff's opposition.  (Docket # 50).  According to Cambisi, these exhibits contain

disciplinary records from Cambisi's personnel file and pertain to incidents unrelated to the one at

issue in this case.  (Docket # 51-1 at 1).  Cambisi maintains that those exhibits, although they are

now judicial documents, should remain sealed in the event that the Court's decision does not rely

upon them.  (*Id.*).  Scott has not opposed that request.

       The Court grants Cambisi's motion to keep Exhibits I and J under seal.  "The

weight of the presumption in favor of public access to judicial documents is governed by 'the

role of the material at issue in the exercise of Article III judicial power and the resultant value of

such information to those monitoring the federal courts.'"  *Saleem v. Corp. Transp. Grp., Ltd.*,

2013 WL 6061340, *8 (S.D.N.Y. 2013) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435

F.3d 110, 119 (2d Cir. 2006)).  My determination on the pending motion does not rely on

Exhibits I and J or any information in them, and the value of that information to those monitoring

---

[13]  As noted above, copies of Exhibits I and J have been filed as part of three different docketing entries –
Docket ## 43-1 at 27-29, 31-39; 44 at 29-31, 33-41; and 45 at 29-31, 33-41.

federal courts is quite limited. *See id.*; *In re Accent Delight Int'l Ltd.*, 2018 WL 2849724, *6 (S.D.N.Y. 2018) ("[a]lthough there is a presumption in favor of public access to judicial documents, in reaching its decisions above, the Court did not need to reference or otherwise rely on the sealed exhibits[;] . . . [a]t best, therefore the weight of any presumption is limited"). In addition, Cambisi has some privacy interests in his disciplinary records; given their lack of relevance to the exhaustion issue determined herein, I find that Cambisi's privacy interests outweigh the public's interest in disclosure. *See Fernandez v. City of New York*, 457 F. Supp. 3d 364, 400 (S.D.N.Y.) ("[d]efendants' disciplinary records were not significant in resolving [d]efendants' motion[;] . . . [d]efendants have a significant privacy interest in their disciplinary records"), *reconsideration denied*, 2020 WL 3448019 (S.D.N.Y. 2020).

Neither party has filed a renewed motion to seal the remaining exhibits submitted by plaintiff. Accordingly, the Clerk of the Court is directed to unseal plaintiff's Exhibits A, B, C, D, E, F, G, H, K, L, M, N, O, P, Q, R, S, and T. (Docket # 44 at 2-27, 42-88).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment **(Docket # 38)** and his motion to seal plaintiff's Exhibits I and J **(Docket # 50)** are **GRANTED**. Scott's claim against Cambisi is dismissed without prejudice.[14] The Clerk of the Court is directed to

---

[14] Defendants have not requested that any dismissal be with prejudice and have not argued or established that "administrative remedies have become unavailable after [Scott] had ample opportunity to use them." *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004).

unseal plaintiff's Exhibits A, B, C, D, E, F, G, H, K, L, M, N, O, P, Q, R, S, and T (Docket # 44

at 2-27, 42-88) and enter judgment in favor Daniel Cambisi.

**IT IS SO ORDERED.**


_____
        _s/Marian W. Payson_
        MARIAN W. PAYSON
        United States Magistrate Judge

Dated:  Rochester, New York
        February 29, 2024